IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 16, 2020

**STATE OF TENNESSEE v. DANNY DEBERRY**

**Appeal from the Circuit Court for Lauderdale County**
**No. 10596    J. Weber McCraw, Judge**

_____

**No. W2020-00367-CCA-R3-CD**
_____

A Lauderdale County jury convicted Danny Deberry ("Defendant") of second degree murder, and the trial court imposed a sentence of thirty years' incarceration. On appeal, Defendant asserts that the evidence presented at trial was insufficient to support his conviction and that the trial court imposed an excessive sentence. Following a thorough review, we determine that the evidence was sufficient for any rational trier of fact to find Defendant guilty of second degree murder beyond a reasonable doubt and that the trial court did not abuse its discretion in sentencing Defendant. Accordingly, Defendant's conviction for second degree murder is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J. ROSS DYER, JJ., joined.

Scott A. Lovelace, Ripley, Tennessee, for the appellant, Danny Deberry.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Mark E. Davidson, District Attorney General; and Julie Pillow, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

In the early morning hours of August 5, 2017, nineteen-year-old Kenneth Jamar Peat ("the victim"), was shot and killed outside The Luau, a club located on Barry Morrow Road in a rural area of Henning. The Lauderdale County Grand Jury subsequently indicted Defendant and Cornelius Phillips ("Co-defendant") for first degree premeditated

murder, possession of a firearm by a convicted felon, and employing a firearm during the commission of a dangerous felony in connection with the victim's death.

At a joint trial, Deputy Marilyn Johnson of the Lauderdale County Sheriff's Department ("LCSD") testified that she responded to a call from The Luau on August 5, 2017. When she arrived at 1:53 a.m., the club's owner directed her to the victim, who was lying on the ground. The victim had no pulse, so Deputy Johnson began chest compressions until paramedics arrived. Deputy Johnson drove the ambulance so that the paramedics could tend to the victim on the way to the hospital. She estimated that there were about 100 to 150 people at the club that morning. She recalled that there were people surrounding the victim when she arrived and that it was "dark out there."

Dr. Erica Curry, a medical examiner with the West Tennessee Regional Forensic Center in Memphis, testified that she conducted the victim's autopsy. Dr. Curry stated that the victim's cause of death was a gunshot wound to the chest and that the manner of death was homicide. Dr. Curry testified that the bullet entered the left side of the victim's chest, fractured a rib, and went through his lung and heart. She recovered the bullet from the victim's heart sac. Dr. Curry stated that she observed additional injuries to the victim, including an abrasion on the left side of his forehead, a bruise on his left upper arm, a scrape to the right forearm, and a scrape on his left hip.

Barry Wynn testified that he was the owner of The Luau and stated that there were about seventy-five people at the club at the time of the offense. Mr. Wynn recalled that, prior to the shooting, a fight broke out inside the club between several individuals, including Robert Lattimore. After pulling Mr. Lattimore outside, Mr. Wynn decided to call law enforcement because the fight was "getting out of control." While outside, Mr. Wynn heard what sounded like a gunshot, and he noticed one or two cars leaving the parking lot immediately afterwards. Several minutes later, Mr. Wynn was told that someone had been shot, and he ran to where the victim was lying on the ground. Mr. Wynn testified that he heard people say that Defendant and someone named "Nate" shot the victim. Mr. Wynn stated that there was a floodlight at the front of the club that operated on a motion sensor and that, because there were a lot of people outside the club, the floodlight would have been on at the time of the shooting.

Coshunya Richardson Deas testified that she knew the victim because she was married to the victim's cousin. Ms. Deas explained that, on the night of the shooting, she was at The Luau and that she and Co-defendant were talking and texting with each other and "going back and forth outside" the club. At one point, Ms. Deas saw Co-defendant come from behind the club "limping." When she asked him what happened, Co-defendant told her to "mind [her] business[.]" Ms. Deas said that Co-defendant was wearing a white

t-shirt, blue jean shorts, and white tennis shoes that night and that he had a "low haircut" and tattoos.

Ms. Deas recalled that Defendant had been involved in a fight at the club prior to the shooting. She witnessed Kyton Arnold "smack" Mr. Lattimore in the head with a bottle, and when Defendant tried to help Mr. Lattimore, Mr. Arnold hit Defendant with the bottle too. Ms. Deas said that, after the fight, everyone went outside. As she stepped outside, Ms. Deas heard two gunshots and "got down[.]" When she stood back up, she saw Defendant and Mr. Lattimore walking towards her. Ms. Deas testified that she did not see who shot the victim.

John L. Walker, Jr., testified that he was related to the victim and that he knew Defendant from "growing up in Lauderdale County." He said that he did not know Co-defendant. Mr. Walker testified that he was at The Luau on the night of the offense and that he helped break up the initial fight. Afterwards, the people involved in the fight went outside. Mr. Walker stated that, as he was walking to his truck, he saw Defendant and Co-defendant standing beside one another in front of Defendant's car and that the victim was standing in front of them "looking at somebody else fight[.]" Mr. Walker stated that the victim had not been fighting inside or outside the club; the victim was watching a fight outside before he was shot. Mr. Walker testified that he saw Defendant go into Defendant's car and retrieve something that Mr. Walker believed was a gun. Mr. Walker acknowledged, however, that he could not see what Defendant took out of his car because it was dark. Mr. Walker stated that either Defendant or Co-defendant threw a bottle and hit the victim in the back of the head. Mr. Walker testified that the victim grabbed his head and turned around to see who threw the bottle and then Mr. Walker heard a gunshot. The victim fell and then got back up and ran. After the shooting, Defendant and Co-defendant "jumped into the passenger side of [Defendant's] car and the car pulled off." Mr. Walker found the victim lying on the ground, and he stayed with the victim until emergency responders arrived. Mr. Walker described the victim as having blood coming out of his mouth and struggling to breathe.

Mr. Walker explained that, after Defendant emerged from the car, Co-defendant "snatched the gun from [Defendant]." Mr. Walker testified, "He took it. To me -- [Co-defendant] took it from [Defendant]" and shot the victim. He stated that it was dark in the parking lot and that Defendant and Co-defendant were both wearing white t-shirts but that Co-defendant was taller than Defendant. Mr. Walker stated that he had never seen Co-defendant before the night of the shooting but that he recalled Co-defendant had tattoos on his hand. Mr. Walker said that he believed there was a third person driving Defendant's car, explaining that Co-defendant and Defendant "jumped in the car and the car pulled off so that let me know somebody else was driving the car."

Mr. Walker said that, although it was dark outside at the time of the shooting, there was a streetlight "right there where they [were] parked[.]" Mr. Walker said that he told Agent Matt Pugh that Co-defendant shot the victim. He explained that he called Agent Pugh after he witnessed Co-defendant "walking around town" and that he later picked Co-defendant out of a photographic lineup. Mr. Walker agreed that, after the shooting while he was tending to the victim, he heard people saying that Defendant shot the victim.

Sherita Upchurch testified that she was at The Luau on the night of August 4, 2017. Ms. Upchurch explained that a fight broke out inside the club after Mr. Lattimore "got jumped on" but that Co-defendant was not involved in the fight. Ms. Upchurch stated that, when she went outside the club, she heard gunshots. Ms. Upchurch immediately looked back towards the location of the gunshots, and she saw someone standing there who had a "[l]ow cut" hairstyle and had on a white t-shirt. Ms. Upchurch testified, however, that she could not identify the shooter because it was dark. Ms. Upchurch testified that she did not see Defendant in the vicinity of where the victim was shot.

Robert Lattimore testified that Defendant was his sister's long-time boyfriend and that Co-defendant was his cousin. He said that he had not known the victim. Mr. Lattimore stated that he was involved in the altercation at The Luau on the night of the shooting. He said that his "head was busted" during the fight and that he did not recall a lot of the events because he "kind of blacked out." He said that he did not recall how the fight started and did not know who hit him with a bottle. Mr. Lattimore recalled that he drove home but that he "barely made it." He said that he did not hear gunshots while at the club; he stated that he first learned about the shooting when he spoke to investigators later in the day on August 5. Mr. Lattimore explained that he gave consent to search his car; he also provided a DNA sample and submitted to a gunshot residue test. He stated that he had nothing to do with the victim's shooting.

Investigator Michael Middlebrook with the LCSD testified that, on August 5, 2017, he responded to Lauderdale Community Hospital where he viewed the victim's body. He explained that the victim had a gunshot wound to the left side of his chest. Investigator Middlebrook said that the witnesses he interviewed about the shooting indicated that the victim was not involved in the fight at the club. Investigator Middlebrook recalled that, during the investigation, he received a letter from Co-defendant, while Co-defendant was in jail. In the letter, Co-defendant said that he was at The Luau when the fight broke out between Mr. Arnold and Mr. Lattimore. He stated that Mr. Arnold threw a bottle at Mr. Lattimore and "that's when everybody started fighting and throwing bottles[.]" Co-defendant said that, as he was making his way out of the club, he noticed someone who was "bleeding bad," and Co-defendant attempted to help the individual out to the parking lot because the injured individual could not see well. Co-defendant stated that he saw the victim "duck[] a bottle" and then run towards the injured individual in the parking lot. The

- 4 -

injured individual then pulled out a small firearm and shot at the victim twice. Co-defendant provided Investigator Middlebrook with a list of witnesses whom Co-defendant claimed could verify that he did not shoot the victim.

Special Agent Matt Pugh with the Tennessee Bureau of Investigation ("TBI") testified that, on August 5, 2017, around 2:40 a.m., he was dispatched to the crime scene at The Luau. Agent Pugh stated that, when he arrived, the scene was secured with crime scene tape across the driveway leading to the club. Agent Pugh learned that the victim had been transported to Lauderdale General Hospital but that the victim had died. Agent Pugh assisted in processing the crime scene and then went to the hospital where he photographed the victim's body and noted a single gunshot wound above the victim's left nipple. Agent Pugh explained that, during autopsy, the medical examiner recovered a bullet from the victim's chest cavity, which the TBI crime laboratory determined had been come from a .22 caliber cartridge.

Agent Pugh testified that he worked with Investigator Middlebrook to gather a list of witnesses from the club. Agent Pugh learned that, prior to the shooting, a fight had started, possibly inside the club's bathroom, and that Mr. Arnold had hit Mr. Lattimore and Defendant in the face with a broken beer bottle, lacerating Mr. Lattimore's left eyebrow and Defendant's right eyebrow. Agent Pugh interviewed Mr. Wynn; Mr. Wynn identified several individuals involved in the altercation, and he said that Mr. Arnold started the fight. A few days after the shooting, Mr. Wynn contacted Agent Pugh and said that investigators should be looking for a man named "Nate," whom Mr. Wynn described as a black male with "a lot of tattoos[.]" Agent Pugh searched Facebook for a "Nate" in Lauderdale County "and found a Nate that matched the description of the person [he] was looking for, a black male with a short fade and a lot of tattoos." Agent Pugh sent a photograph of the man to the victim's mother and asked if she knew him. The victim's mother told Agent Pugh that the man's name was Cornelius Phillips but that he went by "Nate."

Agent Pugh testified that he viewed Co-defendant's Facebook page and found a video posted by Co-defendant within hours of the shooting, which Agent Pugh deemed "threatening in nature." A recording of the video was played for the jury. Agent Pugh noted that, in the video, Co-defendant said, "twelve Larry." Agent Pugh explained that "twelve" was a gang term that meant "love or just signing off" and that "Larry" was a reference to Larry Hooper, the head of the Gangster Disciples in Chicago. In the video, Co-defendant also said, "that's how a man gets dealt with" and commented about people "not gossiping and keeping their hole shut[.]"

Agent Pugh recalled that he interviewed Ms. Deas several times. She viewed two photographic lineups and identified Mr. Arnold and Mr. Lattimore. She identified Co-

defendant in a third photographic lineup and stated that Co-defendant "was out there." Ms. Deas drew a sketch of the scene of the offense outside of the club and indicated that she saw Co-defendant, Mr. Lattimore, Defendant, and the victim outside.

Agent Pugh stated that, several hours after the shooting, he interviewed Mr. Lattimore, who gave consent to search his vehicle and cell phone. Mr. Lattimore also agreed to provide a DNA sample and submit to a gunshot residue test. Mr. Lattimore had a laceration to his left eyebrow, but he refused treatment. Agent Pugh spoke to Defendant on the same day at 1:30 p.m. Defendant agreed to a search of his Dodge Magnum, to provide a DNA sample, and to submit to a gunshot residue test. Agent Pugh explained that Defendant was not interviewed until 1:30 p.m. because Defendant was at the hospital getting stitches for a laceration in his right eyebrow. Agent Pugh stated that he photographed the injuries to both Mr. Lattimore and Defendant.

Agent Pugh testified that, at the time he received consent to search from Defendant, he advised Defendant of his *Miranda* rights, and Defendant provided a written statement. Defendant said that he was inside The Luau on August 4 around 11:30 p.m., when he saw his friend, Mr. Lattimore, talking to Mr. Arnold. Defendant told the two men to "chill out" and then noticed that Mr. Lattimore was bleeding. Defendant continued:

> I went outside with some other folks and sat down. I stayed there about twenty to thirty minutes. Around that time[,] I heard a gunshot. The gunshot was far away from where I was sitting. During that time, I called my girlfriend, [Ms.] Lattimore, to come pick me up. After I heard the gunshot, it appeared that people were walking around like normal. I did not know that anyone had been shot until this morning. It took my girlfriend about twenty to thirty minutes to come pick me up. I left my blue Dodge . . . at the club. My cousin, [Mr.] Shaw, later drove my car home from the club. The police were not there until after I left. Once she picked me up, we went home[,] and she tried to clean up my wound over my eye. We then went to sleep. When I woke up[,] I saw several police cars outside my house. They said they needed to talk to me[,] and I went with them.

Agent Pugh testified that he interviewed Mr. Walker and that Mr. Walker identified Defendant, Mr. Lattimore, and Mr. Arnold in separate photographic lineups as being "in the fight at the club." Mr. Walker also identified Co-defendant in a photographic lineup and stated that Co-defendant was the person who shot the victim. Mr. Walker drew a diagram of the crime scene outside the club for Agent Pugh.

Agent Pugh testified that, during his investigation, he was able to rule out Mr. Lattimore as having been involved in the shooting. He determined that Defendant and Co-defendant were the individuals responsible for the victim's death. Agent Pugh interviewed Co-defendant, and Co-defendant said that he was dropped off at the club around 11:05 p.m. on August 4. He said that he knew Defendant but said that he was not involved in the altercation at the club and that he did not witness the shooting. Co-defendant denied having a gun that night. Co-defendant initially denied having a Facebook page because some of his posted images were "gang-related."

Agent Pugh explained that, after the interview concluded, Co-defendant said that he saw what happened and wanted to speak to the prosecutor about the shooting. Agent Pugh told Co-defendant that he could not speak to the prosecutor and said that he "couldn't make [Co-defendant] any promises." Co-defendant later wrote Agent Pugh and Investigator Middlebrook several letters, providing names of witnesses to interview. Based on one of these letters, Agent Pugh interviewed a cellmate of Co-defendant, DeUndre Winfrey.

Agent Pugh interviewed Co-defendant a second time on December 28, 2017. Co-defendant said that he panicked during his first interview and requested the chance to speak to investigators a second time "to tell the truth[.]" The interview was audio recorded, and Agent Pugh prepared a summary, which was redacted and read to the jury. Co-defendant said that he witnessed the shooting in the parking lot outside the club and that he tried to stop the shooter from firing at the victim. He described the weapon used by the shooter as a black revolver. Co-defendant stated that he believed some of the witnesses "must have gotten him [and the shooter] mixed up" or that witnesses were being "coerced[.]" Co-defendant acknowledged that he got into the car with the shooter as the shooter fled but said that he did so because the shooter was his ride to the club. Co-defendant stated that he was willing to take a polygraph test and that he should have told investigators the truth the first time but did not because he panicked.

On December 28, 2017, Agent Pugh conducted another interview with Defendant. Agent Pugh read Defendant's redacted statement into evidence. During the interview, Defendant denied any knowledge of the shooting, denied that he shot the victim, and denied that he threw a bottle at the victim. Defendant told Agent Pugh that he went to the club in his car with Mr. Shaw but stated that he left the club with his girlfriend, Ms. Lattimore, and that Mr. Shaw drove Defendant's car home. Defendant told Agent Pugh that, at the time of the shooting, he was sitting in a chair at the front of the club and denied that he was standing near his car. He said that the victim was his cousin. Defendant told Agent Pugh that he had heard that Mr. Arnold may have been the shooter. He said that he went outside of the club after hearing two to three shots fired. He stated, "[W]hen [I] first came out of the club, [I] was up for a minute and then someone told

[me] I was bleeding so [I] got a towel and sat down." Defendant stated that he did not know who started the fight at the club but that he recalled seeing Mr. Lattimore, Mr. Arnold, and "a male black with dreadlocks in the middle of the floor talking." About twenty to thirty minutes later, the men were fighting. Defendant told Agent Pugh that he attempted to pull Mr. Lattimore away, and "when he turned around[,] someone hit [Defendant] in the head with a bottle." Defendant said that, after being hit, he went outside and left Mr. Lattimore inside fighting. Defendant denied that anyone helped him to his car after he was injured.

Agent Pugh testified that gunshot residue tests were performed on both Defendant and Mr. Lattimore. Mr. Lattimore's test was done seven hours after the shooting, and Defendant's test was done "a little over twelve hours after the shooting." Agent Pugh testified that, before he conducted the gunshot residue test on Defendant, Defendant had washed his hands and face because Defendant was attempting to stop the bleeding from his eye area. He said that gunshot residue was "very fragile" evidence and that, in his experience, if a suspect was not tested within three hours of an offense, a gunshot residue test was unlikely to yield a positive result. He noted that there was a functioning flood light outside at the front of the club and that the light was pointed towards the area where the shooting occurred. Agent Pugh agreed that it was dark in the area surrounding the club but stated that there were floodlights around the parking lot and that "you can see fine." Agent Pugh stated that the weapon used to shoot the victim was never found.

Special Agent James Russell Davis, II, testified that he was employed by the TBI as a forensic scientist in the area of microanalysis. Agent Davis testified that he examined gunshot residue tests conducted on Defendant and Mr. Lattimore as part of the investigation. He stated that the analysis did not reveal the presence of gunshot residue on Defendant or Mr. Lattimore.

Travis Shaw testified that both the victim and Defendant were his cousins and that Co-defendant was his friend. Mr. Shaw stated that, on the night of August 4, 2017, he went to The Luau with Defendant in Defendant's car. He testified that he later saw Co-defendant at the club but that Co-defendant arrived separately. Mr. Shaw recalled that he was buying a beer inside the club when a fight broke out. Mr. Shaw stood behind the club until the fight was over and people were moving outside. Mr. Shaw said that he stayed inside the club for a while after the fight ended. He said that he did not hear gunshots but that, when he went outside, he heard the sirens of the emergency responders. He said that he did not see who shot the victim and that his sister took him home that night because Defendant and Defendant's car were already gone by the time Mr. Shaw went outside.

Mr. Shaw said that, after Co-defendant was arrested, Co-defendant called him and said, "[T]ell your dude to come take his charge." When Mr. Shaw called Defendant and relayed Co-defendant's comment, Defendant said that he "didn't know what [Co-defendant] was talking about." Mr. Shaw said that he left his cell phone in Defendant's car that night and that he later called Defendant about getting back his cell phone. Mr. Shaw said that he later learned that investigators had his cell phone and Defendant's car. Mr. Shaw denied driving Defendant's car the night of the shooting and said that he did not have the keys to the car. He stated that he assumed Defendant had the keys because Defendant drove to the club that night. Mr. Shaw said that he was not in Defendant's car after the shooting and did not know who was.

Lakeisha Lattimore testified that she had two children with Defendant and that they "grew up with [Co-defendant]." Ms. Lattimore stated that she did not pick Defendant up at The Luau on the morning of August 5. She testified that, if Defendant told the TBI that she picked him up, Defendant was untruthful. She agreed that she initially told investigators that she picked up Defendant that morning because she heard Defendant tell officers, "[M]y girl came to get me." Ms. Lattimore said that she was sleeping in the early morning hours of August 5, 2017, and that, when Defendant came home, "his head [was] busted[.]" Defendant told Ms. Lattimore that "the guys had jumped on him and [Mr. Lattimore.]" Defendant told Ms. Lattimore that he did not know who jumped them, so Ms. Lattimore began looking on Facebook to see "what was being posted[.]" Based on comments on Facebook, Ms. Lattimore told Defendant that "somebody got killed out there[,]" and Defendant responded, "Girl, they'll put anything on Facebook." Ms. Lattimore testified that she tried to get Defendant to go to the hospital but that he did not want to go because he did not have insurance. Ms. Lattimore said that Defendant did not tell her anything about the victim's shooting.

DeUndre Winfrey testified that he shared a cell with Co-defendant at the Lauderdale County Jail for about three months. Mr. Winfrey stated that, while incarcerated together, Co-defendant discussed his pending charges relating to the victim's death. Then, the following exchange occurred:

[THE STATE]: What did [Co-defendant] tell you about the weapon?

[MR. WINFREY]: He told me that [Defendant] had put it down there where the white people fish at, like the bottom . . . .

[THE STATE]: Did he describe what kind of weapon it was?

[MR. WINFREY]: Yes, ma'am.

[THE STATE]: And what kind of weapon did he describe to you?

[MR. WINFREY]: Said it was a black .22 revolver.

Mr. Winfrey stated that Co-defendant told him that he took the revolver into the club that night for protection and that Co-defendant said he "put it in his shoe and carried it in the club." Mr. Winfrey testified that Co-defendant told him that Defendant shot the victim.

Following deliberations, the jury convicted Defendant of the lesser-included offense of second degree murder.[1] The following day, Defendant pled guilty to possession of a firearm by a convicted felon, and the State dismissed the charge of employing a firearm during the commission of a dangerous felony.

At a subsequent sentencing hearing, the State introduced without objection the presentence report. Delores Peat then testified that the victim was her son. She said that the victim had been married with one child and that his wife had been pregnant with their second child at the time of his death. Ms. Peat explained that the victim was at The Luau celebrating a friend's birthday and that he did not normally go to clubs. She said that she did not understand why the victim was shot because he was not involved in the fighting prior to the shooting. Ms. Peat testified that the victim had worked at Crafco with Defendant; she said that Defendant had been fired after being caught breaking into a vehicle in the company parking lot. She stated that the victim was sitting in his truck in the Crafco parking lot when Defendant broke into the vehicle and that she wondered if Defendant thought the victim turned him in to their employer. She believed that Defendant had a grudge against the victim.

Ms. Lattimore testified that she and Defendant had been in a relationship for sixteen years and that they had two children together. She said that Defendant was a good father and active in their children's lives. Ms. Lattimore described Defendant as a good provider, explaining that he was employed at the time of the offense.

At the conclusion of the hearing, the trial court stated:

In determining the appropriate sentence for these offenses, the Court has considered the evidence which was presented at trial and now what's been received today at the sentencing hearing. The Court has received the pre-

---

[1] Although Defendant and Co-defendant were tried jointly, the record on appeal contains no judgment forms pertaining to Co-defendant, and the verdict for Co-defendant is not otherwise reflected in the record.

sentence report with the victim impact statements. The Court considers the arguments made with regard to sentencing. The Court looks to the nature and characteristic of the conduct involved. The Court considers the information offered by the parties on any mitigating and enhancing factors.

The trial court found that Defendant was a Range II multiple offender. Regarding enhancement factors, the trial court found that Defendant "ha[d] a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range." Additionally, the court found that Defendant was released on probation at the time of the offense, that Defendant had no hesitation about committing a crime when the risk to human life was high, and that Defendant employed or possessed a firearm during the commission of the offense. As to mitigating factors, the trial court noted Defendant's argument that the jury's verdict was inconsistent with the evidence at trial. The trial court rejected Defendant's argument, however, noting that the jury found Defendant guilty after considering all the evidence presented. Based on the foregoing, the trial court sentenced Defendant, as a Range II multiple offender, to thirty years for second degree murder.[2]

Defendant filed a timely motion for new trial. Following a hearing, the trial court entered a written order denying relief. This timely appeal follows.

## Analysis

### *Sufficiency of the Evidence*

Defendant asserts that the State failed to prove beyond a reasonable doubt that he was guilty of second degree murder. Defendant argues that the State's witnesses described the shooter as wearing a white t-shirt, blue jean shorts, with tattoos and lowcut hair. Defendant contends that Co-defendant admitted he was wearing a white t-shirt, blue jean shorts, and white shoes at the time of the shooting and that the witnesses identified Co-defendant in a photographic lineup. Defendant further contends that several of the witnesses provided testimony that was inconsistent with statements they provided to investigators. Moreover, the witnesses' descriptions of the layout of the crime scene were inconsistent as they placed Defendant and Co-defendant in differing locations. Defendant further asserts that the State produced no evidence that Defendant had a motive to shoot the victim and no physical evidence suggesting that Defendant fired the deadly shot and that the State failed to produce the murder weapon or link Defendant to the weapon. Finally, he notes that it was Co-defendant who admitted taking a gun into

---

[2] The trial court also imposed a concurrent sentence of eight years for possession of a firearm by a convicted felon. Defendant does not challenge this sentence on appeal.

the club that night in his shoe. The State responds that the evidence is sufficient to support the jury's verdict.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As relevant here, second degree murder is "[a] knowing killing of another[.]" Tenn. Code Ann. § 39-13-210(a)(1) (2017). Second degree murder is a "result of conduct" offense. *See State v. Brown*, 311 S.W.3d 422, 431-32 (Tenn. 2010); *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). Accordingly, the appropriate statutory definition of "knowing" in the context of second degree murder is as follows: "A person acts knowingly with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2017); *see Brown*, 311 S.W.3d at 431.

In its charge to the jury, the trial court instructed the jury on criminal responsibility. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (2017). As pertinent here, "[a] person is criminally responsible for an offense committed by the conduct of another, if[,] . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2) (2017).

Criminal responsibility is not a separate crime but instead a theory by which the State may prove the defendant's guilt based upon another person's conduct. *State v. Osborne*, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing *State v. Mickens*, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)). The defendant need not physically participate in the crime in order to be criminally responsible. *Phillips v. State*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). "[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." *Id*. To be criminally responsible for the acts of another, the defendant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *Hembree v. State*, 546 S.W.2d 235,239 (Tenn. Crim. App. 1976)). The defendant must "knowingly, voluntarily and with common intent unite with the principal offenders in the commission of the crime." *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

When viewed in the light most favorable to the State, the evidence is sufficient to support Defendant's conviction for second degree murder under a theory of criminal responsibility. Prior to the shooting, Defendant and Co-defendant were standing beside one another in front of Defendant's Dodge Magnum, and the victim was standing in front of them "looking at somebody else fight[.]" Mr. Walker saw Defendant get into his car and retrieve something. Although Mr. Walker testified that he could not see the object Defendant took out of the car, the jury could reasonably infer that it was a gun because Mr. Walker testified that he then saw Co-defendant "snatch" or take a gun from Defendant. Either Defendant or Co-defendant threw a bottle at the back of the victim's head, causing the victim to turn around towards them, and then Co-defendant shot the victim in the chest. Both Defendant and Co-defendant jumped into Defendant's car and fled the scene. Co-defendant told Mr. Winfrey that the murder weapon was a black .22 caliber revolver and that Defendant got rid of the gun by "put[ting] it down there where the white people fish at, like the bottom . . . ." Dr. Curry testified that the victim died as a result of the gunshot wound to the chest, and the TBI determined that the bullet recovered from the victim came from a .22 caliber cartridge. Defendant later lied to investigators; he denied any knowledge of the shooting and claimed that Ms. Lattimore picked him up from the club and that Mr. Shaw drove his car to his home. As to Defendant's assertion that several witnesses provided testimony that was inconsistent with statements they provided to investigators, we reiterate that this court does not "reweigh or reevaluate the evidence" and that all "[q]uestions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *Bland*, 958 S.W.2d at 659. From the evidence presented at trial, a reasonable juror could find beyond a reasonable doubt that Defendant knowingly participated in the knowing killing of the victim and that Defendant was aware that the

shooting could result in the victim's death. Defendant is not entitled to relief on this issue.

*Excessive Sentence*

Defendant contends that his sentence of thirty years for second degree murder is excessive. He asserts that the trial court should have imposed the minimum sentence in his range because his prior offenses were "not of the nature that he could not be rehabilitated." The State responds that the trial court acted within its discretion by sentencing Defendant to thirty years' incarceration for the offense of second degree murder.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* Tenn. Code Ann. § 40-35-210 (2019); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103 (2019).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2019); *Bise*, 380 S.W.3d at 706. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2019), Sentencing Comm'n Cmts.

- 14 -

Second degree murder is a Class A felony. Tenn. Code Ann. § 39-13-210(c)(1) (2019). The sentence range for a Range II, multiple offender, convicted of a Class A felony, is not less than twenty-five (25) nor more than forty (40) years. *See* Tenn. Code Ann. § 40-35-112(b)(1) (2019). Within-range sentences that are supported by the record and reflect that the trial court properly applied the purposes and principles of sentencing are reviewed for an abuse of discretion, with a presumption of reasonableness. *Bise*, 380 S.W.3d at 707-08. In this case, the trial court considered the factors set out in section 40-35-210 and stated on the record the reasons for the sentence it imposed. Thus, the trial court's sentencing decisions are entitled to a presumption of reasonableness, and we will review Defendant's within-range sentence under an abuse of discretion standard with a presumption of reasonableness.

Here, the trial court determined that Defendant had a history of criminal convictions or behavior in addition to those necessary to establish the appropriate range. *See* Tenn. Code Ann. § 40-35-114(1) (2019). The court also determined that Defendant committed the murder while on probation for another offense. *See* Tenn. Code Ann. § 40-35-114(8) (2019). The trial court found further that Defendant had no hesitation about committing a crime when the risk to human life was high and that he employed or possessed a firearm during the commission of the murder. *See* Tenn. Code Ann. § 40-35-114(9), (10) (2019).

Because enhancement and mitigating factors are advisory, "the trial court may set a sentence anywhere within the applicable range so long as the sentence is consistent with the principles and purposes of the Act, regardless of the presence or absence of mitigating and enhancement factors." *State v. Mark Elihu Cooper*, No. W2013-02530-CCA-R3-CD, 2014 WL 4384965, at *6 (Tenn. Crim. App. Sept. 5, 2014), *perm. app. denied* (Tenn. Dec. 18, 2014). Thus, the trial court properly exercised its discretion in ordering Defendant to serve a within-range sentence of thirty years after finding that multiple enhancement factors applied. Defendant is not entitled to relief on this claim.

## Conclusion

Based on the foregoing reasons, we affirm Defendant's conviction for second degree murder.

_____
ROBERT L. HOLLOWAY, JR., JUDGE